IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

ADAH ELBE                                                                                    PLAINTIFF

v.                                      Civil No. 09-6011

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                                          DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Adah Elbe, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying her claim for a period of disability and disability insurance benefits ("DIB") under Title II of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

**I.      Procedural Background:**

The plaintiff protectively filed her applications for DIB on August 25, 2004, alleging an onset date of February 21, 2003, due to osteoarthritis, fibromyalgia, Raynaud's syndrome, migraine headaches, depression, attention deficit disorder ("ADD"), and ulcers. (Tr. 20, 38, 73, 106, 108). Plaintiff's application was denied initially and on reconsideration. (Tr. 65, 69). Plaintiff then requested an administrative hearing, which was held on May 17, 2007. (Tr. 35-62). Plaintiff was present and represented by counsel.

At the time of the administrative hearing, plaintiff was 53 years of age and possessed a high school education. (Tr. 27). She had past relevant work ("PRW") experience as a certified nurse's aide and a crossing guard. (Tr. 41-44, 90-97).

On July 18, 2007, the Administrative Law Judge ("ALJ") concluded that, although severe, plaintiff's status post surgery for a torn rotator cuff of the right shoulder and history of degenerative and/or osteoarthritis and/or undifferentiated connective tissue disease with generalized fatigue and symptoms of fibromyalgia did not meet or equal any Appendix 1 listing. (Tr. 22-23). He found that plaintiff maintained the residual functional capacity ("RFC") to perform a full range of light work through September 30, 2005, her date last insured. (Tr. 23). Utilizing the Medical-Vocation Rules ("the Grids"), the ALJ then found that plaintiff could still perform work that existed in significant numbers in the national economy. (Tr. 28).

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on November 24, 2008. (Tr. 7-10). Subsequently, plaintiff filed this action. (Doc. # 1). This case is before the undersigned for report and recommendation. Both parties have filed appeal briefs, and the case is now ready for decision. (Doc. # 9, 10).

**II.    Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Id*. "Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision." *Id.* As long as there is substantial evidence in the record to support the Commissioner's decision, the court may not reverse the decision simply because substantial evidence exists in the record to support a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742,

747 (8th Cir. 2001). If we find it possible "to draw two inconsistent positions from the evidence, and one of those positions represents the Secretary's findings, we must affirm the decision of the Secretary." *Cox*, 495 F.3d at 617 (internal quotation and alteration omitted).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

### A. **The Evaluation Process**:

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his or her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his or her age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)-(f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age,

education, and work experience in light of his or her residual functional capacity. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C.F.R. § § 404.1520, 416.920 (2003).

### III. Discussion:

Of particular concern to the undersigned is the ALJ's RFC assessment. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his or her RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir.2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).

In the present case, the ALJ determined plaintiff could perform a full range of light work. However, the medical evidence indicates that plaintiff had undergone rotator cuff tear repair surgery in 2003 and continued to experience residual pain and crepitance. These limitations were not properly considered by the ALJ.

On February 21, 2003, plaintiff developed sharp, sudden, severe right shoulder pain while transferring a patient from a shower chair. (Tr. 1354). Initially, she was treated by Dr. Swan,

who prescribed cortisone injections and a Medrol Dosepak with minimal or no relief. X-rays showed a type II possible early type III acromion. (Tr. 136). An MRI showed evidence of a rotator cuff tear involving the supraspinatus and evidence of arthritis in the AC joint without impingement. (Tr. 134). Exercise and physical therapy offered her no relief. Dr. Swan scheduled plaintiff for surgery, but plaintiff opted to have Dr. Robert Patek perform the surgery. (Tr. 134).

On April 9, 2003, plaintiff underwent a diagnostic arthroscopy; arthroscopic acromioplasty; open rotator cuff repair; arthroscopic debridement of the posterior glenoid labrum and superior aspect of the subscapularis tendon; and arthroscopic subtotal synovectomy due to a torn rotator cuff in the right shoulder. (Tr. 115-118). Following surgery, plaintiff participated in physical therapy. (Tr. 119). Records indicate that she was gradually gaining range of motion and strength. Pain was still present, but diminished. Further, plaintiff was compliant with her home exercise program. (Tr. 119).

On April 21, 2003, plaintiff followed-up with Dr. Patek's physician's assistant. (Tr. 133). Overall, she was doing quite well. She did complain of occasional throbbing and was taking Vicodin as needed. Sheri Shindelar noted that her range of motion was limited to Codman exercises. X-rays showed no lytic or blastic lesions and no fracture or dislocation. Ms. Shindelar advised plaintiff to keep her arm in the sling and continued the Codman exercises, as well as passive range of motion exercises in physical therapy. She stated that plaintiff would not be able to return to work for a minimum of four to six weeks. (Tr. 133).

On May 20, 2003, plaintiff was just over five weeks postoperative open rotator cuff repair. (Tr. 132). She was doing very well and her passive motion was excellent. Her

5

movement pattern was markedly better and her elbow, wrist, and hand examination was normal. Plaintiff's x-rays showed adequate resection on the underside of the acromion. No calcification was seen. Dr. Patek stated that she could continue with the rehabilitation program he had outlined and suggested that she reinitiate use of Celebrex, ice, activity modification, and return for a follow-up in mid-June. He indicated that plaintiff could not return to full duty work because she had restricted movement and weakness associated with the repair. Dr. Patek noted plaintiff would have restrictions placed on the use of her right upper extremity. (Tr. 132).

On June 12, 2003, Dr. Patek noted that plaintiff had been doing well in therapy until they had begun doing active exercises with resistance. (Tr. 130-131). She had developed recurrent soreness in her shoulder, not as severe, but present with overhead activity and movement with exercise. Plaintiff described her pain as superior/anterior shoulder pain and reported no specific trauma. Although her range of motion had improved, Dr. Patek noted that plaintiff's overall condition had worsened. He determined that she should remain off full duty work due to his concerns about her shoulder and the physical nature of her job. Dr. Patek also prescribed ice, a Medrol Dosepak, a home exercise routine for stretching and flexibility, and the resumption of physical therapy when she moved to Arkansas. He also recommended that she seek treatment at the Hot Springs Bone and Joint Clinic and physical therapy through the Hot Springs Physical Therapy for Orthopedic and Sports PT. (Tr. 130-131).

On January 02, 2004, plaintiff stated that her shoulder was improving with the assistance of physical therapy. (Tr. 129). However, she had noticed that her strength and endurance were still diminished after completing twelve sessions of physical therapy. Plaintiff had also recently relocated and had not yet had any follow-up care with an orthopedist in her area. On

6

examination, plaintiff had a full passive range of motion with pain and crepitance in the right shoulder and a persistent decrease with regard to her endurance. X-rays were essentially unremarkable. Dr. Patek felt plaintiff would benefit from continued physical therapy. He also prescribed Celebrex and ordered blood work to evaluation her liver functions. Dr. Patek then released plaintiff to return to full work duty without restrictions but minimizing overhead activities and overhead lifting, if possible. (Tr. 129).

On February 17, 2004, plaintiff was evaluated by Dr. James Logan of Heritage Physician Group. (Tr. 146-148). Plaintiff had reportedly been followed by a rheumatologist in Illinois due to an episodic rash, arthralgia, myalgia, and undifferentiated connective tissue disease. Dr. Logan also noted a few records indicating that plaintiff had been diagnosed with fibromyalgia. Plaintiff told Dr. Logan that she experienced episodes of swelling in her hands and wrists with associated shoulder and lower extremity pain. According to plaintiff, this responded to steroids. She also reported increased arthralgia and myalgia, with pain along the medial aspect of the left ankle. An examination revealed some slight limitation of right wrist extension, crepitance on the right shoulder, patellofemoral crepitance in each knee, mild valgus changes in both ankles, bony enlargements in MTP joints, some tenderness between the right second and third MTP joints, patches of vitiligo on the forearms and chest wall, and a livedo reticularis pattern. Dr. Logan believed plaintiff had symptoms associated with osteoarthritis and fibromyalgia syndrome. He stated that she was not showing any signs or symptoms associated with undifferentiated connective tissue disease, but did report Raynaud's phenomenon in the winter months and episodes of lichen planus. Accordingly, he prescribed Dapsone and advised her to continue her other medications. He also ordered blood tests to check her ANA levels and

7

rheumatoid factor. (Tr. 147-148). Test results showed that her ALT level was high. (Tr. 149).

On August 30, 2004, Dr. William Cole treated plaintiff for her postmenopausal status, degenerative arthritis, and fatigue. (Tr. 123). Dr. Cole prescribed Celebrex and Xanax. (Tr. 123).

On February 5, 2005, plaintiff reported experiencing left arm, crampy type pain that subsided on its own. (Tr. 120). She denied chest or neck pain and shortness of breath. A physical examination was normal with no significant pain to palpation of the left arm. Dr. Cole diagnosed plaintiff with left arm cramping and indicated that he would refer her to a heart specialist if the symptoms recurred. (Tr. 120).

On April 28, 2005, plaintiff reported doing fairly well until the last few weeks, at which point she developed arthralgia affecting the left shoulder over the lateral and posterior aspects. (Tr. 144-145). Plaintiff had been begun experiencing some difficulty raising her left arm above the level of her head or reaching behind her back. Plaintiff was tolerating her medication fairly well, but reported some problems with non-restful sleep. An examination revealed crepitance in both shoulders and knees. There was a slight limitation of abduction and external rotation in the left shoulder, pain and stiffness with resisted flexion and internal rotation, and bony enlargement in the MTP joints. Dr. Logan was concerned that plaintiff had a left rotator cuff impingement. He indicated that she also had some osteoarthritis, as well as fibromyalgia. As such, he was of the opinion that she was a candidate for injections to the rotator cuff. Dr. Logan ordered an MRI, administered a Xylocaine and Kenalog injection, and advised plaintiff to perform regular exercises. He also advised her to stop the Celebrex and begin Lodine. (Tr. 144-145).

8

On May 3, 2005, an MRI of her left shoulder showed no significant spurring, no partial or full thickness rotator cuff tear, no evidence of a labral tear, and no erosions. (Tr. 144-145, 159).

On September 1, 2005, Dr. Susan Broy, wrote a letter indicating that she had treated plaintiff for undifferentiated connective tissue disease from the mid-1990s until plaintiff moved to Arkansas. (Tr. 128). She indicated that plaintiff's condition was characterized by Raynaud's vertigo, lichen planus diagnosed on biopsy, arthralgias, generalized fatigue, dry eyes, and nasal sores. Dr. Broy also stated that plaintiff had experienced problems with rotator cuff tears necessitating surgery. Over the years, plaintiff had been prescribed Plaquenil, but this resulted in the development of inflammatory arthritis. Plaintiff was then prescribed Prednisone and, while the steroid was helpful in controlling her diffuse joint and muscle pain, she continued to experience severe pain, malaise, and generalized fatigue. Dr. Broy noted that plaintiff's condition was exacerbated by stress. She had recommended that plaintiff avoid stressful situations and get adequate rest. Dr. Broy stated that plaintiff's condition would require ongoing pain management. (Tr. 128). On November 4, 2005, plaintiff reported experiencing neck and shoulder pain for the previous four weeks. (Tr. 142). She had been using heat, ice, and Advil. The doctor noted some swelling in the fingers of her right hand. There was also a decreased range of motion in her cervical spine and some abnormality in the examination of her lumbar spine and hips, although the doctor's handwriting is difficult to discern. Plaintiff was diagnosed with osteoarthritis, fibromyalgia syndrome, and Raynaud's syndrome. (Tr. 142).

X-rays of plaintiff's cervical, thoracic, and lumbar spine also revealed some straightening of the normal cervical curvature. (Tr. 155). Otherwise, the x-rays were unremarkable. (Tr. 155).

On November 30, 2005, plaintiff continued to experience neck and shoulder pain with only slight improvement. (Tr. 141). She was directed to continue physical therapy and to follow-up in two weeks. (Tr. 141).

The evidence clearly indicates that plaintiff's shoulder impairments would likely result in limitations concerning her ability to reach and perform repetitive strenuous activities involving her upper extremities. As such, we do not find substantial evidence to support the ALJ's determination that plaintiff could perform a full range of light work. Therefore, the case must be remanded to allow the ALJ to reconsider plaintiff's RFC.

Further, the record indicates that plaintiff was diagnosed with fibromyalgia and was receiving treatment for this condition, prior to her date last insured. Fibromyalgia is a condition that causes pain in fibrous tissues, muscles, tendons, ligaments and other "white" connective tissues. Its cause or causes are unknown, there is no cure, and, perhaps of greatest importance to disability law, its symptoms are entirely subjective. There are no laboratory tests for the presence or severity of fibromyalgia. *Brosnahan v. Barnhart*, 336 F.3d 671, 672 n.1 (8th Cir. 2003). The disease is chronic, and "[d]iagnosis is usually made [only] after eliminating other conditions." *Id*. The principal symptoms are "pain all over," trauma, anxiety fatigue, disturbed sleep, stiffness, irritable bowel symptoms, and—the only symptom that discriminates between it and other diseases of a rheumatic character— multiple tender spots, more precisely eighteen fixed locations on the body that when pressed firmly cause the patient who really has fibromyalgia to flinch. *See* THE MERCK MANUAL 1369-1371 (16th ed. 1992). The Eighth Circuit has held, in the context of a fibromyalgia case, that the ability to engage in activities such as cooking, cleaning, and hobbies, does not constitute substantial evidence of the ability to

10

engage in substantial gainful activity. *Brosnahan*, 336 F.3d 671, 677 (8th Cir. 2003); *See Kelley v. Callahan,* 133 F.3d 583, 588-89 (8th Cir. 1998).

In his opinion, the ALJ merely states that plaintiff was treated for this condition, but does consider the limitations caused by this impairment. Accordingly, on remand, the ALJ is directed to reconsider the evidence and plaintiff's diagnosis of fibromyalgia. He should also request that plaintiff's treating doctors complete a physical RFC assessment giving their opinion of her limitations as of her date last insured.

In addition, the ALJ seems to conclude that plaintiff's mental impairments (depression and anxiety disorder) are not severe. While we do note that there is no evidence during the relevant time period to show that plaintiff sought treatment from a mental health professional, the record does reveal that plaintiff was prescribed Xanax. As this is not a medication generally prescribed to patients with mild anxiety, we believe the ALJ should also reevaluate the evidence concerning plaintiff' s mental impairments.

**IV.   Conclusion:**

Based on the foregoing, we recommend reversing the decision of the ALJ and remanding this case to the Commissioner for further consideration pursuant to sentence four of 42 U.S.C. § 405(g). **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 11th day of March 2010.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE